IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MELISSA LYNN RAMBOW

        Plaintiff,

                                        3:16-CV-00796-PK

                                        FINDINGS AND
v.                                     RECOMMENDATION

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

        Defendant.
_____

PAPAK, Magistrate Judge:

       Plaintiff Melissa Rambow protectively filed this action March 22, 2012, seeking judicial

review of the Commissioner of Social Security's final decision denying her application for

disability insurance benefits ("DIB") under Title II of the Social Security Act (the "Act"). This

court has jurisdiction over Rambow's action pursuant to 42 U.S.C. § 405(g) and 1383(c)(3).

       Rambow challenges the Commissioner's conclusion that she was able to perform her past

relevant work as an office specialist prior to March 1, 2013 on several grounds. Rambow argues that the ALJ failed to: (1) find her depression, anxiety, and "rule out" neurocognitive disorders were severe impairments at step two of the five-step sequential evaluation process; (2) fully and fairly develop the record; (3) properly credit the medical opinion of treating neurologist, Dr. Kevin Jamison and examining psychologist, Dr. Cheryl Brischetto, Ph.D.; (4) provide a clear and convincing reason to discredit her subjective symptom testimony; (5) provide a legally sufficient reason to reject lay witness testimony; (6) develop an RFC supported by the record; and (7) propound a hypothetical to the vocational expert ("VE") supported by the record, thus erring in relying on the VE's testimony that she could perform her past relevant work prior to becoming disabled beginning March 1, 2013. For the reasons set forth below, the Commissioner's final decision should be affirmed.

## DISABILITY ANALYSIS FRAMEWORK

To establish disability within the meaning of the Act, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner has established a five-step sequential process for determining whether a claimant has made the requisite demonstration. *See Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); *see also* 20 C.F.R. § 404.1520(a)(4).[1] At the first four steps of the process, the burden of proof is on the claimant; only at the fifth and final step does the burden of proof shift to the Commissioner. *See Tackett v. Apfel*, 180 F.3d 1094, 1098

---

[1]Effective March 27, 2017, updates were made to the regulations. Some C.F.R. sections referenced have been renumbered and the citations listed here are the versions of the C.F.R. that were in effect at the time Rambow requested judicial review.

(9th Cir. 1999).

At the first step, the ALJ considers the claimant's work activity, if any. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. § 404.1520(a)(4)(i). If the ALJ finds that the claimant is engaged in substantial gainful activity, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. §§ 404.1520(a)(4)(i), 404.1520(b). Otherwise, the evaluation will proceed to the second step.

At the second step, the ALJ considers the medical severity of the claimant's impairments. *See Bowen*, 482 U.S. at 140-141; *see also* 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is "severe" if it significantly limits the claimant's ability to perform basic work activities and is expected to persist for a period of twelve months or longer. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. § 404.1520(c). The ability to perform basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b); *see also Bowen*, 482 U.S. at 141. If the ALJ finds that the claimant's impairments are not severe or do not meet the duration requirement, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c). Nevertheless, it is well established that "the step-two inquiry is a de minimis screening device to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996), *citing Bowen*, 482 U.S. at 153-154. "An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has 'no more than a minimal effect on an individual[']s ability to work.'" *Id.*, *quoting* S.S.R. 85-28, 1985 SSR LEXIS 19 (1985).

If the claimant's impairments are severe, the evaluation will proceed to the third step, at which the ALJ determines whether the claimant's impairments meet or equal "one of a number

of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d). If the claimant's impairments are equivalent to one of the impairments enumerated in 20 C.F.R. § 404, subpt. P, app. 1, the claimant will conclusively be found disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d).

If the claimant's impairments are not equivalent to one of the enumerated impairments, between the third and the fourth steps the ALJ is required to assess the claimant's residual functional capacity ("RFC"), based on all the relevant medical and other evidence in the claimant's case record. *See* 20 C.F.R. § 404.1520(e). The RFC is an estimate of the claimant's capacity to perform sustained, work-related physical and/or mental activities on a regular and continuing basis,[2] despite the limitations imposed by the claimant's impairments. *See* 20 C.F.R. § 404.1545(a); *see also* S.S.R. No. 96-8p, 1996 SSR LEXIS 5 (July 2, 1996).

At the fourth step of the evaluation process, the ALJ considers the RFC in relation to the claimant's past relevant work. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. § 404.1520(a)(4)(iv). If, in light of the claimant's RFC, the ALJ determines that the claimant can still perform his or her past relevant work, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f). In the event the claimant is no longer capable of performing his or her past relevant work, the evaluation will proceed to the fifth and final step, at which the burden of proof shifts, for the first time, to the Commissioner.

---

[2] "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." S.S.R. No. 96-8p, 1996 SSR LEXIS 5 (July 2, 1996).

At the fifth step of the evaluation process, the ALJ considers the RFC in relation to the claimant's age, education, and work experience to determine whether a person with those characteristics and RFC could perform any jobs that exist in significant numbers in the national economy. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1560(c), 404.1566. If the Commissioner meets her burden to demonstrate the existence in significant numbers in the national economy of jobs capable of being performed by a person with the RFC assessed by the ALJ between the third and fourth steps of the five-step process, the claimant is found not to be disabled. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1560(c), 404.1566. A claimant will be found entitled to benefits if the Commissioner fails to meet that burden at the fifth step. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g).

## LEGAL STANDARD

A reviewing court must affirm an Administrative Law Judge's decision if the ALJ applied proper legal standards and his or her findings are supported by substantial evidence in the record. *See* 42 U.S.C. § 405(g); *see also Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). "'Substantial evidence' means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007), *citing Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).

The court must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Id.*, *quoting Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The court may not substitute its judgment for that of

the Commissioner. *See id.*, *citing Robbins*, 466 F.3d at 882; *see also Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001). Moreover, the court may not rely upon its own independent findings of fact in determining whether the ALJ's findings are supported by substantial evidence of record. *See Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003), *citing SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). If the ALJ's interpretation of the evidence is rational, it is immaterial that the evidence may be "susceptible [of] more than one rational interpretation." *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989), *citing Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984).

## SUMMARY OF ADMINISTRATIVE RECORD[3]

Rambow was born January 29, 1970. Tr. 39, 182.[4] She speaks English, graduated high school, and completed an administrative assistant program at Columbia College of Business. Tr. 42, 208. According to the evidence of record, prior to her amended disability onset date of September 1, 2011, Rambow worked as an office manager, office specialist, and an in-home day care assistant. Tr. 42-46, 48, 62, 201, 208, 222-26.

The earliest medical evidence in the administrative record is from March 2004, when Rambow had an MRI of her brain performed at the Samaritan Albany General Hospital Radiology Department. Tr. 345. Dr. Anthony Pappas reviewed the MRI and found Rambow had a "notable increase in the number of white matter lesions" in her brain since her last examination in 2000. Tr. 345-46.

---

[3] The following recitation constitutes a summary of the evidence contained within the Administrative Record, and does not reflect any independent finding of fact by the court.

[4] Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative record filed herein as Docket No. 12.

The next medical evidence in the administrative record is from October 16, 2006, when Rambow was seen by ANP Debra O'Halloran to refill her prescription of Clonazepam, which Rambow was taking for her multiple sclerosis ("MS") and anxiety. Tr. 300. Ms. O'Halloran noted that Rambow's MS "has been fairly stable," but she "gets significant muscle fatigue." *Id.* The following month, Rambow had an appointment with Dr. Kevin Jamison who noted Rambow's complaints of "generalized fatigue," urinary urgency, and some issues with balance and numbness. Tr. 354, 529. Dr. Jamison assessed Rambow with multiple sclerosis but noted it was "quite stable," and planned for another MRI scan. *Id.*

On December 26, 2006, Rambow underwent an MRI of her brain. Tr. 316, 356. Results showed white matter lesions, which were noted by Dr. Scott Mills to be "consistent with patient's diagnosis of multiple sclerosis," yet "none of the lesions demonstrates abnormal contrast enhancement which would be indicative of an active demyelinating process." *Id.* Dr. Mills additionally wrote that the MRI was "consistent with a stable MRI appearance of MS." Tr. 359.

Almost nine months later, on September 17, 2007, Rambow returned for a follow-up appointment with Ms. O'Halloran. Tr. 298. During the appointment, Ms. O'Halloran noted "some depression," writing that Rambow had been unable to afford an antidepressant, but had reported that Effexor had worked in the past. *Id.* Ms. O'Halloran placed Rambow on Ciralopram, and renewed Rambow's prescription for Clonzaepam for her panic attacks. *Id.*

On June 3, 2008, Rambow had another follow-up appointment with Dr. Jamison concerning her MS. Tr. 360-61, 524-25. Rambow reported recurring hand numbness and clumsiness after she ran out of Avonex two weeks before her appointment, but reported no other relapses. Tr. 360, 524. Dr. Jamison reported that Rambow's MS was "quite stable," that

"fatigue" was her main complaint, and continued her on Avonex. Tr. 360, 524-25.

During 2009, Rambow returned for two additional follow-up appointments with Dr. Jamison, and a physical examination with NP Debra Todd. Rambow's first appointment with Dr. Jamison was on April 14, 2009, where she reported that she had quit her Avonex injections because they were "increasingly painful," and fatigue was "still a main issue." Tr. 362, 522. Dr. Jamison wrote that Rambow had "full strength in the lower extremities," and her gait was unremarkable. *Id.* Again, Dr. Jamison noted that Rambow's MS was "quite stable," but started her on Rebif because she was no longer tolerating the Avonex injection pain. *Id.*

On September 29, 2009, Rambow had a routine physical examination with NP Debra Todd. Tr. 292-95. During her appointment, Rambow reported that she had quit her MS injections, but was "doing OK" with her MS. Tr. 292. Ms. Todd wrote that Rambow complained of fatigue, had no chest pain or discomfort, no muscle aches, and no limb swelling. Tr. 292-93. Overall Ms. Todd noted that Rambow had a "[n]ormal routine history and physical," and assessed her with sinusitis and depression. Tr. 293.

On December 1, 2009, Rambow had her second follow-up appointment with Dr. Jamison that year. Tr. 365-66, 513-14. Rambow complained of "severe constant headaches and abdominal pain" stating that she used ibuprofen, and occasionally Vicodin, for her daily headaches. Tr. 365, 513. Dr. Jamison wrote that Rambow had no MS flare ups, but that she continued to complain of fatigue, including fatigue in her legs with activity. *Id.* Rambow also reported pain in her fingers and temporomandibular joint ("TMJ") regions, and occasional dizziness or lightheadedness. *Id.* Dr. Jamison assessed her with "MS, clinically stable," but noted that "[t]roublesome symptoms include fatigue and headaches." Tr. 366, 514. He

prescribed Rambow with Amantadine for her headaches, and to follow-up yearly, or as-needed, for additional treatment. *Id.*

On March 2, 2010, Rambow returned to see Dr. Jamison. Tr. 367-68. Rambow complained of dizziness, right leg weakness and dragging, painful right arm joints and right hand numbness. Tr. 367. On examination, Dr. Jamison found that Rambow had full strength in all four extremities and an unremarkable gait. *Id.* He assessed her with clinically stable MS, with various subjective complaints, and scheduled another MRI. Tr. 368. Later that month, on March 17, 2010, Rambow had an MRI of her brain taken. Tr. 318-19, 371-72. Dr. Stephanie Rufener, the interpreting radiologist, noted that there was "no significant interval change in confluent and multifocal white matter lesions bilaterally," noting that imaging was "compatible with the provided clinical history of multiple sclerosis." Tr. 318, 371. She also noted that "no new lesions are identified." *Id.*

On April 1, 2010, Rambow returned for a follow-up appointment with Dr. Jamison to review her MRI. Tr. 373-74. Dr. Jamison wrote that Rambow had no new symptoms and was "feeling well." Tr. 373. Dr. Jamison reported that Rambow's MS was clinically stable and her MRI was "reassuringly stable since 2006." *Id.* He wrote Rambow should return for a "repeat MRI in eighteen months, or sooner if clinically required." *Id.* Five months later, Rambow came in for another follow-up visit with Dr. Jamison where he wrote that Rambow's right side was weaker, her knees give way, and her right foot drags occasionally. Tr. 303, 375, 511. Upon examination, Dr. Jamison found that Rambow had full strength in her legs. *Id.* Rambow expressed interest in trying a steroid for her right sided symptoms, so Dr. Jamison prescribed Prednisone and Prozac. *Id.*

During 2011, Rambow had numerous follow-up appointments with Dr. Jamison and FNP Todd. *See* Tr. 305, 307, 309, 320, 377, 379, 381, 453, 456, 459, 462, 507-09. The first of these appointments was on March 2, 2011, when Rambow met with NP Todd and reported a desire to continue taking Effexor for her mild depression, that she had started to have headaches, and that she wanted to stop smoking. Tr. 462-65. Ms. Todd wrote that Rambow showed fatigue, and depression, but had no muscle aches or limb swelling. Tr. 462-63. Ms. Todd assessed Rambow with nicotine dependence and depression, but otherwise found Rambow had a routine and normal history and physical. Tr. 464.

On April 6, 2011, Rambow had a follow-up appointment with Dr. Jamison who recommended she have another MRI. Tr. 305-06, 509-10. The following day, Rambow underwent an MRI which showed a "new subcentimeter lesion within white matter of the R frontal lobe." Tr. 307, 379. About a month later, on May 4, 2011, Rambow reported to Dr. Jamison that her right sided numbness and weakness was improving. Tr. 309, 381. At that time, Dr. Jamison also noted the new white matter lesion and, again, recommended Rambow have another MRI done in a year. *Id.*

On May 23, 2011, Rambow had an appointment with Ms. Todd where Rambow reported pain in her jaw, hands, wrist, arms, and shoulders. Tr. 459. Rambow was diagnosed with temporormandibular joint pain dysfunction syndrome, shoulder tendonitis, and tenosynovitis[5] of the hand/wrist, and was given a referral for physical therapy. Tr. 460. A few months later, Rambow returned with complaints of hip pain, which Ms. Todd diagnosed as bursitis of the hip.

---

[5]Tenosynovitis is "inflammation of the lining of the sheath that surrounds a tendon (a cord that joins muscle to bone). *See* NIH U.S. National Library of Medicine, Medicine Plus, https://medlineplus.gov/ency/article/001242.htm.

Tr. 456. On September 22, 2011, Rambow returned to Ms. Todd with continued complaints of hip, right shoulder, arm, and wrist pain. Tr. 453. Ms. Todd recommended the use of ibuprofen and heat for the pain. Tr. 455. Rambow was also offered physical therapy, which she declined. *Id.*

On February 27, 2012, Rambow had a physical examination done at Oregon Orthopedic and Sports Medicine. Tr. 503-04. Upon examination, Rambow was noted to have muscle spasms, uncomfortable shoulder motion, and was assessed with subacroimal bursitis. Tr. 503. Rambow was recommended a stretching program and anti-inflammatory medication. *Id.*

On March 26, 2012, Rambow had a follow-up MRI of her brain where multiple new enhancing lesions were identified. Tr. 322. Dr. Rufener wrote it was her impression that findings from the MRI were "compatible with disease progression." Tr. 323. The next month, on April 17, 2012, Rambow had an MRI of her cervical spine done which showed "multifocal dorsal cord signal abnormalities," which were noted to be "most likely related to the patient's history of MS." Tr. 500. Four days later, Rambow had a follow-up appointment with Dr. Jamison to discuss her MRI results. Tr. 497. During this appointment Dr. Jamison initiated the start of Avonex for her enhancing lesions and recommended she see a neurosurgeon for her neck. Tr. 499. A few days later, Rambow had an appointment with ANP Tanya Scheiber-Mirek to discuss her MRI results and her continued neck and arm pain, during which time she was assessed with a herniated intervertebral disc. Tr. 433, 435.

During April and May 2012, Rambow saw a couple physicians for her neck pain. Tr. 490-96. After these appointments Rambow underwent a micro discectomy. Tr. 484-85.

On April 6, 2012, Rambow filed for disability insurance benefits alleging disability

beginning October 25, 2008. Tr. 182-88.

During July 2012, Rambow sought treatment for gastrointestinal bleeding. Tr. 424, 427, 470, 546, 549, 556, 558, 577, 581. Rambow believed this was related to her use of Diclofenac, and after emergency room doctors had her stop taking it her bleeding was resolved. Tr. 577.

On July 5, 2012, Rambow completed an Adult Function Report. Tr. 235-42. Rambow wrote that the right side of her body was affected by her condition, and she gets "fatigued fairly easy." Tr. 235. She noted some difficulties performing personal care and receiving help from her son and son's girlfriend with caring for her dog, housework, and yard work. Tr. 236, 238. Rambow also wrote that she was able to prepare meals, go shopping, drive a car, and visits family and friends about two times a week. Tr. 237-39.

During August 2012, Rambow had follow-up appointments with Dr. Jamison and Ms. Todd where she was treated for her new enhancing lesions, and her neck pain. Tr. 533, 543, 571, 573, 597, 601. Dr. Jamison discussed the use of Gilenya for her MS because Rambow had become intolerant of Avonex and Copaxone. Tr. 601.

On August 6, 2012, the Agency determined that Rambow was not disabled for purposes of the Act. Tr. 69-80.

On February 13, 2013, the Agency found on reconsideration that Rambow was not disabled for purposes of the Act. Tr. 84-94.

On April 30, 2013, Rambow requested a hearing before an ALJ. Tr. 111-18.

On May 7, 2013, Rambow had an appointment with Dr. Jamison, who noted that Rambow had not tolerated the Gilenya, and was tearful, depressed, and having trouble with anxiety. Tr. 681. Dr. Jamison prescribed Venlafaxine for her anxiety, and a month later, wrote

that Rambow's depression and anxiety were "well treated" with the Venlafaxine. Tr. 682, 684.

On September 19, 2013, Rambow returned for a follow-up appointment with NP Todd where she complained of fatigue and requested she be checked for arthritis in her hands, elbows, and wrists. Tr. 740. Ms. Todd assessed her with arthralgias[6] in multiple sites, MS, and fatigue. Tr. 741.

On November 28, 2013, Rambow was seen at the emergency department after being involved in a motor vehicle accident. Tr. 750. She complained of neck and back pain, stiffness, and some soreness in both hands. *Id.* She was discharged and advised to apply cold packs to her injuries, and to follow up with her primary care provider for persisting or worsening symptoms. Tr. 752.

On February 21, 2014, Rambow had another visit with Dr. Jamison. Tr. 686. Dr. Jamison noted that Rambow's right leg "gives her trouble when she walks distances" and her fatigue is "a major issue." *Id.* Additionally, Dr. Jamison wrote that Rambow's anxiety attacks were "under control," noting that her depression and anxiety were well treated with Venflaxine, and additionally prescribed Amantadine for energy. Tr. 686-87.

On February 26, 2014, Rambow underwent a Psychodiagnostic Examination performed by Cheryl Brischetto, Ph.D. Tr. 607-12. Upon examination, Dr. Brischetto wrote that Rambow believed she was unable to work because she suffers from multiple sclerosis that causes right side weakness in her arms, legs, and hands, her balance is "off," she experiences pain in both of her hands, "fuzzy vision" in her right eye, and occasional urinary and bowel urgency. Tr. 607.

---

[6]Arthralgia is inflammation or pain from within the joint itself. Mayo Clinic, http://www.mayoclinic.org/symptoms/joint-pain/basics/definition/sym-20050668.

Rambow additionally told Dr. Brischetto that her mood was "pretty good most of the time," that she "tries to be 'upbeat and positive,'" and she did not have current problems with her depression, noting her use of antidepressants. *Id.* With respect to her mental health limitations, Dr. Brischetto evaluated Rambow and noted she had "clear and coherent language," logical thinking, was alert and fully oriented, and did not appear to be in any acute emotional distress. Tr. 610-11. Dr. Brischetto wrote that Rambow "did not fit criteria for a Depressive Disorder or Anxiety Disorder" and diagnosed Rambow with rule out mild neurocognitive disorder due to multiple sclerosis. Tr. 611-12.

On March 10, 2014, Rambow had an appointment with NP Mary Gibson. Tr. 755-58. Upon examination, Ms. Gibson noted that Rambow was previously diagnosed with MS, which appeared to be in remission, and wrote she had normal mood, affect, behavior, judgment and thought content. Tr. 755, 757. Ms. Gibson additionally noted that Rambow had lumps on her skin, mostly on her lower left arm, but found her left lower arm was non-tender on examination. Tr. 755.

On June 30, 2014, Rambow had an x-ray taken of her right hand, which showed her right hand was intact with "no osseous or soft tissue abnormality identified," and "[n]o significant degenerative changes seen." Tr. 679.

On July 16, 2014, Rambow had an appointment with FNP Andreana Gentile. Tr. 676-78. Ms. Gentile diagnosed Rambow with insomnia, unspecified, and prescribed Trazodone to help Rambow sleep. Tr. 676.

On July 23, 2014, Dr. Jamison completed a Disability Questionnaire on behalf of Rambow. Tr. 689-93. Dr. Jamison wrote that Rambow suffered from multiple sclerosis, cervical

radiculopathy, depression, and anxiety. Tr. 689. He wrote that the primary symptoms of her impairments were fatigue, which he described was of "disabling severity," right side weakness, and depression. *Id.* Dr. Jamison wrote that Rambow did not suffer from functional limitations that limit the forceful or repetitive use of her arms or hands, and that she would be able to occasionally reach, and frequently handle, finger, and feel with both her hands. Tr. 690. Dr. Jamison limited Rambow to occasionally lifting thirty pounds; frequently carrying twenty pounds; standing or walking for six hours in an eight-hour day; sitting for six hours in an eight-hour day; unlimited pushing and pulling; occasionally climbing, balancing, stooping, bending, and crouching; and never kneeling or crawling. Tr. 691. He thought Rambow might miss sixteen hours or more of work a month because of her impairments, symptoms, medications, and their side effects, but none of her symptoms would interfere with her ability to sustain basic attention and concentration needed to perform simple work tasks. Tr. 692. Overall, Dr. Jamison found that Rambow was "likely to find fatigue a problem" that would "limit her work hours." Tr. 693. A little over a week later, on July 31, 2014, Dr. Jamison completed a supplemental form clarifying his responses in the questionnaire. Tr. 833-34. On the supplemental form, Dr. Jamison checked the box "yes" that Rambow would be expected, on average, to miss at least eight hours per month from simple and routine sedentary jobs due to her impairments, symptoms, medications, and their side effects. Tr. 833.

On July 30, 2014, Rambow had an appointment with Dr. Joshua Leibovitz for complaints of right sided jaw pain. Tr. 820-26. Rambow described a "spontaneous onset" of her jaw feeling like it was out of alignment, and pain on both sides of her TMJ, pain opening her mouth, and having developed a headache. Tr. 820. Upon examination, Dr. Leibovitz found her external ear

and ear canal were normal, she had normal mood and affect, and normal behavior and judgment. Tr. 822. Dr. Leibovitz recommended Rambow switch to a soft diet for the next one to two weeks, take ibuprofen and Hydrocodone for pain, and recommended using a night guard while sleeping. Tr. 823-24.

On July 31, 2014, Rambow had a hearing before the ALJ. Tr. 34-68. At the hearing, she amended her alleged onset date to September 1, 2011. Tr. 48. She testified to suffering from anxiety, depression, fatigue, trouble with her right hand, and panic attacks. Tr. 41, 47, 50, 53-59. The ALJ asked VE Gary Jesky to identify Rambow's past relevant work, which the VE identified included office manager and office specialist. Tr. 62. Next, the ALJ propounded hypotheticals to the VE, wherein the VE testified that a person with the given limitations could perform the past relevant work as an office specialist. Tr. 63-64. However, after adding the additional limitation that the individual would miss at least sixteen hours of work per month, the VE testified that an individual with that limitation would not be able to sustain competitive employment. Tr. 65.

On August 29, 2014, the ALJ denied Rambow's application for DIB. Tr. 11-33. Rambow timely requested review of the ALJ's decision on October 24, 2014, and the Appeals Council denied her request on March 23, 2016. Tr. 1-6. In consequence, the ALJ's decision on October 24, 2014 became the Administration's final order for purposes of judicial review. See 20 C.F.R. § 422.210(a); *see also, e.g., Sims v. Apfel*, 530 U.S. 103, 107 (2000). This action followed.

## SUMMARY OF ALJ FINDINGS

At the first step of the five-step sequential evaluation process, the Administrative Law

Judge found that Rambow did not engage in substantial gainful activity since September 1, 2011, the alleged onset date. Tr. 17. She therefore proceeded appropriately to the second step of the analysis.

At the second step, the ALJ found that Rambow's medical impairments of multiple sclerosis and status post cervical fusion were "severe" for purposes of the Act. Tr. 17-18. Because the impairments caused by Rambow's MS and status post cervical fusion were deemed severe, the ALJ properly proceeded to the third step of the analysis. *Id.*

At the third step, the ALJ found that none of Rambow's impairments was the equivalent of any of the impairments enumerated in 20 C.F.R. § 404, Subpart P, App. 1. Tr. 18. Specifically, the ALJ found that Rambow's MS did not meet or equal listing 11.09, and that she did not have the "disorganization of motor function" described in 11.04B, or the "visual or mental impairments as described under the criteria in 2.02, 2.03, 2.04, or 12.02." *Id.* Additionally, the ALJ found Rambow's status post cervical fusion did not meet or equal listing 1.04, disorders of the spine, because there was "no evidence of nerve root compression, spinal arachnoiditis or lumbar spinal stenosis resulting in pseudoclaudication preventing the claimant from being able to ambulate effectively." *Id.* The ALJ therefore properly conducted an assessment of Rambow's residual functional capacity ("RFC").

Regarding Rambow's RFC, the ALJ found that prior to March 1, 2013, the date the claimant became disabled:

> the claimant had the residual functional capacity to perform less than the full range of light work as defined in 20 C.F.R. 404.1567(b), and specifically: she could frequently lift and/or carry up to ten pounds and occasionally lift and/or carry up to 20 pounds; she could stand or walk two hours at a time for up to six hours in an eight-hour-workday; she could

perform only occasional reaching at shoulder height and above bilaterally; she was limited to occasional climbing of ramps and stairs; she could not climb ladders, ropes, or scaffolding; she could occasionally balance, stoop, and crouch; she could never kneel or crawl; she needed to avoid exposure to extremes of heat and cold; she needed to avoid exposure to hazards such as unprotected heights and dangerous machinery.

Tr. 18-19.

Next, the ALJ found that beginning on March 1, 2013:

the claimant has the residual functional capacity to perform less than the full range of light work as defined in 20 CFR 404.1567(b), and specifically: she can frequently lift and/or carry up to ten pounds and occasionally lift and/or carry up to 20 pounds; she can stand or walk two hours at a time for up to six hours in an eight-hour-workday; she can sit for two hours at a time for up to six hours in an eight-hour-workday; she can perform only occasional reaching at shoulder height and above bilaterally; she is limited to occasional climbing of ramps and stairs; she cannot climb ladders, ropes, or scaffolding; she can occasionally balance, stoop, and crouch; she can never kneel or crawl; she needs to avoid exposure to extremes of heat and cold; she needs to avoid exposure to hazards such as unprotected heights and dangerous machinery. Because of fatigue from MS, she would miss at least 16 hours of work per month.

Tr. 23-25. In reaching these findings, the ALJ considered all of the material objective medical evidence in the record bearing directly upon Rambow's asserted impairments, as well as Rambow's own statements regarding her symptoms. Tr. 18-25.

At the fourth step of the five-step process, the ALJ found that prior to March 1, 2013, Rambow was capable of performing her past relevant work as an office specialist, but beginning March 1, 2013, Rambow's RFC prevented her from being able to perform her past relevant work. Tr. 25.

At the fifth step, the ALJ found that since March 1, 2013, in light of Rambow's age, education, work experience, and RFC there were no jobs existing in significant numbers in the

national economy that she could perform. Tr. 26. On that basis, the ALJ concluded that Rambow "was not disabled prior to March 1, 2013, but became disabled on that date and has continued to be disabled through the date of [her] decision." *Id.*

## ANALYSIS

Rambow challenges the Commissioner's conclusion of her ability to perform her past relevant work as an office specialist prior to March 1, 2013 on several grounds. Rambow argues that the ALJ failed to: (1) find her depression, anxiety, and "rule out" neurocognitive disorders were severe impairments at step two of the five-step sequential evaluation process; (2) fully and fairly develop the record; (3) properly credit the medical opinion of treating neurologist, Dr. Kevin Jamison and examining psychologist, Dr. Cheryl Brischetto, Ph.D.; (4) provide a clear and convincing reason to discredit her subjective symptom testimony; (5) provide a legally sufficient reason to reject lay witness testimony; (6) develop an RFC supported by the record; and (7) propound a hypothetical to the vocational expert ("VE") supported by the record, thus erring in relying on the VE's testimony that she could perform her past relevant work prior to becoming disabled beginning March 1, 2013.

## I.    The ALJ's Step Two Findings

Rambow argues that the ALJ erred by failing to find her depression, anxiety, and rule out neurocognitive disorder were severe impairments at step two, and as a result, both formulated an inaccurate RFC, and posed hypotheticals to the VE that did not reflect all of her limitations. Pl.'s Opening Br. 2-21, Pl.'s Reply Br. 1-5.

At step two of the sequential analysis, the ALJ determines whether the claimant has a medically determinable impairment or combination of impairments. 20 C.F.R. § 404.1520(a). A

medically determinable impairment is deemed "severe" if it "significantly limits the claimant's

ability to do basic work activities." 20 C.F.R. § 404.1520(a)(4)(ii).[7] Step two findings must be

based upon medical evidence. *Id.* "Omissions at step two are harmless if the ALJ's subsequent

evaluation considered the effect of the impairment omitted at step two." *Harrison v. Astrue*,

2011 WL 2619504, *7 (D. Or. July 1, 2011) (*citing Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir.

2007)).

In support of her contention that her depression, anxiety, and rule out neurocognitive

disorder were "severe" medically determinable impairments, Rambow cites the medical opinion

evidence of Dr. Kevin Jamison; NP Debra Todd; Dr. Cheryl Brischetto, Ph.D.; Dr. Dorothy

Anderson, Ph.D.; and Dr. Michael Dennis, Ph.D.. Pl.'s Opening Br. 2. However, the ALJ

reasonably found none of her mental impairments were severe.

*A. Rambow's Depression and Anxiety*

Here, the ALJ evaluated Rambow's depression, anxiety, and panic disorder, overall

finding that Rambow had only mild restrictions in activities of daily living, mild difficulties in

maintaining social functioning, mild difficulties maintaining concentration, persistence, and

pace, and no periods of decompensation. Tr. 17. In making these findings, the ALJ cited

---

[7]"Basic work activities are the abilities and aptitudes necessary to do most jobs. Examples of these include -
(1)     Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
(2)     Capacities for seeing, hearing, and speaking;
(3)     Understanding, carrying out, and remembering simple instructions;
(4)     Use of judgment;
(5)     Responding appropriately to supervision, co-workers and usual work situations; and
(6)     Dealing with changes in a routine work setting."
20 C.F.R. § 404.1521(a).

numerous medical records and reports.

First, the ALJ noted that Rambow lived alone, drove, shopped, prepared meals, and managed her finances. *Id.* "An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a). Next, the ALJ considered the medical opinion of Dr. Jamison who "never noted any cognitive deficits on examination." Tr. 17. Third, the ALJ wrote that Rambow had never been hospitalized for mental health treatment, nor sought or received mental health counseling. Tr. 17-18. Fourth, the ALJ noted a 2014 psychological examination performed by Dr. Brischetto where Rambow "reported that her mood was 'pretty good most of the time,' and she tried to be 'upbeat and positive.'" Tr. 18. Finally, the ALJ found that Rambow was using antidepressants, reported no current problems with depression, and further noted that medical records showed Rambow's depression and anxiety disorders were "well controlled with Effexor and an occasional tab of Klonopin." *Id.* "Impairments that can be controlled effectively with medication are not disabling." *Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006) (citations omitted). Indeed, an independent review of the medical record supports the ALJ's findings. Additionally, any error is harmless because the ALJ considered Rambow's depression and anxiety when evaluating her RFC. See Tr. 22-23; *see also Harrison*, 2011 WL 2619504, *7 (step two omissions are harmless where the ALJ considered the effect of the impairment during the subsequent evaluation.) In sum, the ALJ provided substantial evidence to show that Rambow's depression and anxiety were not severe impairments at step two.

*B. Rambow's Rule Out Neurocognitive Disorder*

Next, Rambow argues the ALJ erred by failing to find her rule out neurocognitive

disorder was a "medically determinable" or "severe" impairment at step two. Pl.'s Opening Br. 4, Pl.'s Reply Br. 1-5. Here, the ALJ noted Dr. Brischetto's diagnosis of rule out neurocognitive disorder, but did not find it was a severe impairment. Tr. 18. Although the ALJ failed to make any specific findings regarding Rambow's rule out neurocognitive disorder, again any alleged error is harmless because the ALJ found Rambow had other severe impairments at step two, continued with the sequential analysis, and reasonably considered the medical opinions concerning her alleged mental health limitations when evaluating Rambow's RFC. Tr. 22-23, *see also Stout v. Comm'r Soc. Sec. Admin.*, 454 F.3d 1050, 1055 (9th Cir. 2006) (an ALJ's mistake is harmless where it is nonprejudicial to the claimant). There is no error.

## II.    ALJ's Duty to Develop the Record

Alternatively, Rambow argues that the ALJ erred by failing to "fully and fairly develop the record" because she failed to order "additional psychological evaluation or testing regarding a potential cognitive disorder" based on Dr. Brischetto's diagnosis of rule out neurocognitive disorder. Pl.'s Opening Br. 4, Pl.'s Reply Br. 1, 3-5.

The ALJ has an independent duty to fully and fairly develop the record, whether or not the claimant is represented by counsel. *Smolen*, 80 F.3d at 1283. However, the duty to further develop the record is only required where "there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes v. Massanari*, 276 F.3d 454, 460 (9th Cir. 2001); *see also McLeod v. Astrue*, 640 F.3d 881, 885 (9th Cir. 2010).

Rambow argues that the ALJ was required to further develop the record and order additional psychological testing based on Dr. Brischetto's findings of rule out neurocognitive disorder, but this court disagrees. This court finds the medical evidence was neither ambiguous,

Page 22 - FINDINGS AND RECOMMENDATION

nor inadequate to allow for a proper evaluation of the evidence. Here, Dr. Brischetto used only equivocal language to describe the need for additional testing, writing that Rambow "*might* want to be considered for a neuropsychological screening" if "more specific information is needed about cognition," yet made no specific finding that Rambow needed additional testing performed. Tr. 612 (emphasis added). Overall, "the ALJ is the final arbiter with respect to resolving ambiguities in the medical evidence." *Tommasetti v. Astrue*, 533 F.3d 1035, 1041-42 (9th Cir. 2008) (*citing Andrews v. Shalala*, 53 F.3d 1035, 1039-40 (9th Cir. 1995). Here, the ALJ reasonably assessed the medical opinion evidence concerning Rambow's mental health impairments and found they were not severe, as discussed above. Tr. 17. Although Rambow disagrees with the ALJ's interpretation of the medical record, "[w]hen the evidence before the ALJ is subject to more than one rational interpretation, we must defer to the ALJ's conclusion." *Batson*, 359 F.3d at 1198. Therefore, the court finds the ALJ reasonably evaluated Rambow's cognitive abilities, as discussed above, and was not required to further develop the record. There is no error.

## III.    Evaluation of Medical Opinion Evidence

Next, Rambow argues that the ALJ erred by failing to provide a legally sufficient reason to reject the medical opinion evidence of treating neurologist, Dr. Kevin Jamison, and examining psychologist, Dr. Cheryl Brischetto. Pl.'s Opening Br. 21-25, Pl's Reply Br. 10-12.

An ALJ may reject the uncontradicted medical opinion of a treating or examining physician only for "clear and convincing" reasons supported by substantial evidence in the record. *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005) (citing *Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir. 1995)). An ALJ may reject the contradicted opinion of a treating or

examining doctor by providing "specific and legitimate reasons that are supported by substantial evidence." *Id.*

## A. Treating Neurologist, Dr. Kevin Jamison

First, Rambow argues that the ALJ failed to address Dr. Jamison's opinion that Rambow's "pain, fatigue, and weakness would interfere with the attention and concentration needed to perform even simple work tasks for up to 1/3 of a workday," and she would "miss at least 8 hours…per month from even a simple routine sedentary job." Pl.'s Opening Br. 22-23. Specifically, Rambow argues that the ALJ needed to provide a clear and convincing reason for rejecting this part of Dr. Jamison's medical opinion. Pl.'s Opening Br. 23, Pl.'s Reply Br. 10-12.

As an initial matter, this court rejects Rambow's argument that the ALJ was required to provide a clear and convincing reason to reject the medical opinion of Dr. Jamison, because the court finds Dr. Jamison's medical opinion was contradicted by the medical opinions of reviewing physicians Dr. Neal Berner and Dr. Martin Lahr. *See* Tr. 76-80, 89-91; *see also Bayliss*, 427 F.3d at 1216 (an ALJ need only provide a specific and legitimate reason to discount the contradicted opinion of a treating or examining doctor.) Because Dr. Jamison's medical opinion was contradicted the ALJ was only required to give a specific and legitimate reason for discrediting it.

Next, the court rejects Rambow's argument that the ALJ failed to address Dr. Jamison's opinion that Rambow's "pain, fatigue, and weakness would interfere with the attention and concentration required to perform simple work tasks for up to 1/3 of a workday." Pl.'s Opening Br. 22. Here, the ALJ specifically noted these findings in her decision, writing that Rambow's "pain, fatigue, and weakness would occasionally interfere with attention and concentration for

even simple work tasks" and "claimant's attention and concentration would be impaired 10% of the workweek." Tr. 25. The court fails to see how the ALJ did not address this part of Dr. Jamison's medical opinion given her direct mention of it.

Finally, the court finds the ALJ did not err in failing to provide a legally sufficient reason for rejecting Dr. Jamison's medical opinion when assessing Rambow's RFC. The ALJ did not reject Dr. Jamison's medical opinion, but merely gave it "some weight," noting "it is somewhat consistent with the record beginning in March 1, 2013." Tr. 25. Here, the ALJ considered Dr. Jamison's medical opinion when evaluating Rambow's RFC and overall included Dr. Jamison's findings in the RFC assessment, specifically noting that Rambow would miss at least 16 hours of work per month. Tr. 23-24. The ALJ reasonably considered Dr. Jamison's medical opinion and there is no error. Additionally, any alleged error is harmless because the ALJ determined Rambow was disabled beginning March 1, 2013, based on the RFC assessment that included Dr. Jamison's medical opinion from July 23, 2014, which was at issue.

B.    *Examining Psychologist, Dr. Cheryl Brischetto*

Next, Rambow argues that the ALJ failed to provide a legally sufficient reason to reject Dr. Brischetto's medical opinion that Rambow had "moderate impairment in understanding, remembering, and carrying out complex instructions" and in her "ability to make judgments on complex work related decisions." Pl.'s Opening Br. 24, Pl.'s Reply Br. 11-12.

Here, the ALJ considered Dr. Brischetto's February 2014 examinations, but gave her medical opinion "little weight" finding that her findings were inconsistent with her own examination conclusions that Rambow was not diagnosed with any mental health impairment. Tr. 22. An ALJ may find inconsistency between a doctor's chart notes and the doctor's ultimate

opinion a valid reason to reject their opinion. *See Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014) (citations omitted). Indeed, an independent review of the record supports the ALJ's finding. *See* Tr. 604, 607-12. The ALJ provided a legally sufficient reason to reject Dr. Brischetto's medical opinion. Therefore the court finds no error.

## IV.    Rambow's Subjective Symptom Testimony

Next, Rambow contends the ALJ failed to provide a clear and convincing reason for discrediting her subjective symptom testimony. Pl.'s Opening Br. 25-30, Pl.'s Reply Br. 12. Specifically, Rambow argues that the ALJ erred by finding her depression and anxiety not "severe" based on her activities of daily living which included driving, shopping, living alone, and managing her finances. Pl.'s Opening Br. 25. Additionally, Rambow argues that the ALJ offered no additional reasons to discredit her testimony about how she became disabled as of September 1, 2011, arguing that the ALJ offered "only conclusions and implications, not clear and convincing reasons." Pl.'s Opening Br. 29.

If "there is no affirmative evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.'" *Tommasetti*, 533 F.3d at 1039 (quoting *Smolen*, 80 F.3d at 1281, 1283-84). A general assertion that the claimant is not credible is insufficient; the ALJ must "state which . . . testimony is not credible and what evidence suggests the complaints are not credible." *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993). The reasons proffered must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) (internal citation omitted).

Page 26 - FINDINGS AND RECOMMENDATION

At the hearing, Rambow testified that she had difficulty with anxiety, fatigue, and problems with her right hand. Tr. 41, 49-54. She also testified that she has good and bad days, and on bad days she would watch TV all day. Tr. 55. Rambow testified that she gets too tired to get things done, relies on her left hand to do the majority of things, and experiences panic attacks about once a week. Tr. 56-58.

First, the court rejects the first part of Rambow's argument, noting that Rambow essentially requests another review of the ALJ's step two findings regarding the severity of her alleged impairments. Since the court found no error at step two, the court need not address this issue again.

With respect to the second part of Rambow's argument, the court finds the ALJ provided a clear and convincing reason, supported by substantial evidence, to reject Rambow's subjective symptom testimony relating to the time period at issue: the alleged onset date of September 1, 2011 through March 1, 2013, the date the ALJ found was disabled. Here, the ALJ found that Rambow's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms prior to March 1, 2013," yet her statements "concerning the intensity, persistence and limiting effects of her symptoms are not entirely credible prior to March 1, 2013." Tr. 19. The ALJ found Rambow was "partially credible" noting that her testimony was not consistent with medical records prior to March 1, 2013. Tr. 23. Specifically, the ALJ noted that Rambow testified to having "severe hand limitations and fatigue," but found the record reflected that she "rarely complained of these problems prior to March 1, 2013." *Id.* "Although lack of medical evidence cannot form the sole basis for discrediting pain testimony, it is a factor that the ALJ can consider in his credibility analysis." *Burch v. Barnhart*, 400 F.3d 676, 681 (9th

Cir. 2005). Additionally, the ALJ noted that Rambow gave "dramatic testimony regarding her anxiety and depression symptoms," which the ALJ found contradicted treatment notes and evidence that her mental health symptoms were well controlled with medication. Tr. 23. The effectiveness of medications is a factor the ALJ may consider when evaluating a claimant's subjective symptom testimony. *See Orteza*, 50 F.3d at 750. Although Rambow complained of hand numbness, fatigue, depression, and anxiety, the ALJ reasonably found her limitations were not supported by the record. Indeed, prior to March 1, 2013, the medical record shows numerous reports of Rambow's MS described as "stable," having full strength in her extremities, and exhibiting only "mild depression," which had been controlled by Effexor in the past. *See* Tr. 298, 360, 362, 367, 462, 522, 524-25. While variable interpretations of this evidence may exist, the ALJ's analysis was nonetheless reasonable, such that it must be upheld. *See Batson*, 359 F.3d at 1198. In sum, the ALJ provided a clear and convincing reason, supported by substantial evidence, for rejecting Rambow's subjective symptom testimony.

## V.    Lay Witness Testimony

Next, Rambow argues that the ALJ erred by failing to provide a legally sufficient reason to reject the lay witness testimony of Tyler Ellis and Sarah Hanson. Despite Rambow's assertion, the court finds she has waived this argument. *See Carmickle v. Comm'r Soc. Sec. Admin.*, 533 F.3d 1155, 1161 n.2 (9th Cir. 2008) (citing *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1164 (9th Cir. 2003) ("noting that we 'ordinarily will not consider matters on appeal that are not specifically and distinctly argued in a appellant's opening brief'"). Here, Rambow included her argument as a heading in her opening brief, but made no other substantive argument. See Pl.'s Opening Br. 25. For this reason, the court concludes that Rambow waives

this argument, and therefore need not address it.

## VI.  RFC Assessment

Next, Rambow argues that the ALJ erred in formulating her RFC because it did not

include all of her limitations.  Pl.'s Opening Br. 31.

The RFC is the maximum a claimant can do despite his limitations.  *See* 20 C.F.R. §

404.1545.  In determining the RFC, the ALJ must consider limitations imposed by all of

claimant's impairments, even those that are not severe, and evaluate "all of the relevant medical

and other evidence," including the claimant's testimony.  SSR 96-8p.  The ALJ is responsible for

resolving conflicts in the medical testimony and translating the claimant's impairments into

concrete functional limitations in the RFC.  *Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1174

(9th Cir. 2008).  Only limitations supported by substantial evidence must be incorporated into the

RFC and, by extension, the dispositive hypothetical questions posed to the VE.  *Osenbrock v.*

*Apfel*, 240 F.3d 1157, 1163-65 (9th Cir. 2001).

Here, the ALJ reasonably discredited Rambow's testimony and addressed the medical

opinions of Dr. Jamison and Dr. Brischetto.  Therefore, the ALJ reasonably determined

Rambow's RFC assessment with respect to the limitations supported by the medical records.  Tr.

18-25.  There is no error.

## VII.  VE Hypothetical

Finally, Rambow argues that the VE's testimony was unsupported by law and fact

because the ALJ's RFC assessment failed to include all of the limitations from all of her

impairments.  Pl.'s Opening Br. 31.

"At step four of the sequential analysis, the claimant has the burden to prove he cannot

perform his prior relevant work 'either as actually performed or as generally performed in the national economy.'" *Carmickle*, 533 F.3d at 1166 (citation omitted). "Although the burden of proof lies with the claimant at step four, the ALJ still has the duty to make the requisite factual findings to support his conclusion." *Pinto v. Massanari*, 249 F.3d 840, 844 (9th Cir. 2001). The ALJ may call a VE to testify at the hearing to present expert opinion evidence identifying occupations listed in the Dictionary of Occupational Titles that a claimant retains the capacity to perform given his RFC. *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 689 (9th Cir. 2009). The VE's testimony may also cover a claimant's ability to perform past relevant work, as generally performed in the national economy, or as actually performed by the claimant. *Pinto*, 249 F.3d at 845.

Typically, the ALJ propounds a hypothetical question to the VE that is based on medical assumptions supported by the record and reflects all of the claimant's limitations. *Osenbrock*, 240 F.3d at 1163-64. If the claimant fails to present evidence that she suffers from certain limitations, the ALJ need not include those alleged impairments in the hypothetical question to the VE. *Id.*

Here, the ALJ propounded a hypothetical to the VE based on the RFC finding. Tr. 63-65. Under the hypothetical, the VE found that prior to March 1, 2013, Rambow could perform her past relevant work as an office specialist. Tr. 25. As discussed above, the ALJ reasonably assessed Rambow's subjective symptom testimony and the medical evidence of record when assessing Rambow's RFC. Therefore, the hypothetical propounded to the VE incorporated all of Rambow's limitations, and the ALJ did not err in relying on the VE's testimony.

///

## CONCLUSION

For the reasons set forth above, the Commissioner's final decision denying Rambow's application for disability insurance benefits should be affirmed. A final judgment should be prepared.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.


Dated this 31st day of August, 2017.

Honorable Paul Papak
United States Magistrate Judge